## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AMBROGA CARSON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:18-cv-01986-KOB** |
| **ANDREW SAUL, Commissioner of Social Security,** | ] | |
| | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 23, 2017, the claimant, Ambroga Carson, protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental social security income.  In his application, the claimant alleged disability beginning on October 15, 2016 because of PTSD, chronic insomnia, IBS, erectile dysfunction, and anxiety. The Commissioner denied the application on September 29, 2017.  The claimant then timely requested a hearing before an Administrative Law Judge and the ALJ held a hearing on April 15, 2018.

In a decision dated June 7, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was thus ineligible for social security disability benefits. The Appeals Council rejected a subsequent request for review.  Consequently, the ALJ's decision became the final decision of the Commissioner.  The claimant has exhausted his administrative remedies and the court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, the court will affirm the decision of the Commissioner.

## II.  ISSUES PRESENTED

The claimant presents the following issues for review:

(1)  whether the ALJ erred by failing to properly evaluate the medical opinions on the record;

(2)  whether the ALJ erroneously discounted the claimant's 100% disability rating from the VA when evaluating the claimant's residual functioning capacity;

(3)  whether the ALJ erred by finding the claimant's irritable bowel syndrome and insomnia to be non-severe impairments; and

(4)  whether the ALJ failed to afford the claimant a full and fair hearing.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  The court must find the Commissioner's decision conclusive if he applied the correct legal standards and if substantial evidence supports his factual conclusions.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No presumption of validity attaches to the [Commissioner's] legal conclusions, including the determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.  The court will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functioning capacity, and the application of vocational factors "are not medical opinions . . . but are instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether a claimant meets a listing and is qualified for social security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). So, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the ALJ's decision, but also must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."

To determine whether a person is entitled to disability benefits, the Commissioner employs a five step, sequential evaluation process:

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

Several rules apply to the five-step process that govern the court's review of the ALJ's decision in this case. At step two, an impairment is severe if it significantly affects a claimant's ability to perform work-related activities, regardless of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a). At step five, when evaluating whether the claimant can perform any other work within the economy, the ALJ commits reversible error if he fails to state with particularity the weight he gave different medical opinions and explain his reasons for doing so. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Also at step five, if a disability rating from the VA exists on the record, then "the ALJ must seriously consider and closely scrutinize the V.A.'s disability determination and must give specific reasons if the ALJ discounts that determination." *Brown-Gaudet-Evans v. Comm'r of Soc.* Sec., 673 App'x 902, 904 (11th Cir. 2016) (citing *Rodriguez v. Schweiker*, 640 F.2d 682, 684 (5th Cir. 1981)). And the ALJ commits reversible error if he does not afford the claimant a full and fair hearing, which includes the claimant's due process right to the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Martz v. Commissioner*, 649 F. App'x 948, 962 (11th Cir. 2016) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)). The court will explain these rules in further detail when analyzing the claimant's assignments of error below.

## V. FACTS

At the time of the ALJ's adjudication, the claimant was 45 years old. The claimant has a 12th grade education and past relevant work experience as a combat rifle crew member and drill instructor in the U.S. Marine Corps and as a customer service clerk in the Social Security Administration. The claimant alleges disability based on PTSD, chronic insomnia, IBS, erectile dysfunction, and anxiety.

*The Claimant's Medical Records*

On August 20, 2015, the claimant met with Michelle Nault, LPC, of Cahaba Oaks. (R. 659-60). The claimant reported high levels of stress and hyper-vigilant behavior. He said that he had ideations of impending danger. Ms. Nault noted in her report that the claimant had "fair to good" concentration and that his memory was active and within normal limits. Ms. Nault noted that the claimant's GAF score was 45. When the claimant returned to see Ms. Nault on November 11, 2015, she noted that the claimant's GAF score was 50.

On November 17, 2015, the claimant met with Dr. James Flournoy at the VA Medical Clinic. (R. 461-69). Dr. Flournoy completed a PTSD disability questionnaire with the claimant. Dr. Flournoy noted that the claimant had occupational and social impairment with an occasional decrease in work efficiency along with intermittent periods where he could not perform occupational tasks. Dr. Flournoy noted that the claimant's general functioning was satisfactory with normal routine behavior, self-care, and conversation.

On March 8, 2016, Ms. Nault completed a "Certificate of Health Care Provider for Employee's Serious Health Condition." (R. 845-48). Ms. Nault's report indicated that she had counseled the claimant since August 2015. After reviewing a description of the claimant's job as a customer service representative at the Social Security Administration, she opined that the

claimant could not perform the job function of interfacing with the public in person or on the phone due to PTSD symptoms. She opined that his sleep could be interrupted by his PTSD symptoms, making him unable to keep regular work hours and requiring him to take time off work. She opined that the claimant would need a flexible schedule that allowed him to attend up to three therapy sessions a week and to see a psychiatrist. She also opined that the claimant would experience one flare-up per week that could last one to two days and would force the claimant to stay at home.

On September 1, 2016, Dr. Erin Hanover, a psychiatrist at Cahaba Oaks, completed a PTSD disability form for the claimant. (R. 772-77). Dr. Hanover's report indicated that she had seen the claimant from July 2015 to January 2016. Dr. Hanover opined that the claimant's mental diagnosis resulted in total occupational and social impairment. Dr. Hanover's report also indicated that the claimant's PTSD symptoms had improved in January 2016.

On October 26, 2016, Dr. Mary Hawke filled out a disability benefits questionnaire with the claimant. (R. 594-98). The claimant reported alternating days of diarrhea and constipation with some abdominal cramping over the last six months. The claimant said that he was taking Metamucil and Tums to help alleviate the symptoms of diarrhea and constipation.

On November 15, 2016, Ms. Nault wrote a letter to the claimant's employer requesting that he be excused from work from October 31 through November 30, 2016 because of PTSD symptoms. (R. 791-93). She also requested that the claimant have a change in position once he returned to work.

On January 30, 2017, the VA sent the claimant a letter informing him about his entitlement to VA benefits. (R. 151-68). The VA determined that the claimant was entitled to a total monthly benefit of $3,542.98. (R. 151). The VA decided on this amount by reviewing the

medical records discussed above and assigning disability percentages to each of the claimant's military service-related medical conditions. The VA assigned a 30% rating to the claimant's IBS, the highest possible rating for IBS. (R. 153). The VA assigned a 100% rating to the claimant's PTSD. (R. 154). And the VA assigned the claimant a 100% combined disability rating, which meant that the VA considered the claimant totally disabled under VA regulations and that the claimant was entitled to the maximum allowed benefits from the VA. (R. 154).

On April 20, 2017, the claimant met with Dr. Nadia Tayeb at the VA Medical Center. (R. 378-84). The claimant reported an overall improvement in PTSD and anxiety symptoms, improved coping skills, and successful application of behavioral techniques acquired in therapy. He said that he was a light sleeper and generally only slept three to four hours a night. He denied suicidal and homicidal ideations or symptoms of mania or psychosis. He said that he had normal energy and appetite. His mental status exam was normal. Dr. Tayeb advised the claimant to continue taking Fluoxetine and Mirtazapine, to start taking Trazodone for sleep, and to continue therapy for PTSD. The psychiatry note attached to Dr. Tayeb's report indicated that the claimant only complained about his sleep issues. He also said that he was considering discontinuing his therapy and that he had mixed feelings about his work because he was getting paid less.

On May 2, 2017, Dr. Muhammad Kalim Ali conducted a neurological exam on the claimant. (R. 374-76). Dr. Ali noted that the claimant's memory was grossly intact and that the claimant demonstrated good attention and concentration. The claimant also reported having chronic IBS, feeling constipated most of the time, and experiencing abdominal discomfort at times. He said that he was currently taking Metamucil and stool softeners for his constipation. Dr. Ali advised him to add more fiber to his diet and stay hydrated.

On July 12, 2017, Kristen Foster contacted the claimant to notify him of PTSD services at the VA Medical Center through the PTSD clinical team and other available resources. (R. 720). The claimant declined all referral options and indicated that he was fine with his current mental health providers. He also denied any significant mental health concerns at that time.

On July 19, 2017, the claimant saw Dr. Sebastien at the VA Medical Center psychiatry clinic. (R. 711-19). The claimant said that he stopped working because it was too stressful. The claimant said that when he was working he would complete his work in two to three hours and that in his free time he did things that "did not go well with others." He said he was currently doing some volunteer work. He reported periods of moodiness and getting aggravated easily. Although the claimant's mental exam was normal, Dr. Sebastien noted that the claimant's conditions had worsened some.

On September 19, 2017, the claimant saw Dr. Sebastien again. (R. 902-09). The claimant said that he did housework like laundering clothes and preparing dinner, and that he liked to watch television and read. He said that he did not leave the house much on weekdays except to go to his medical appointments. He said that he did not feel anxious at home and that he did not socialize outside of his family. The claimant said that he had no other significant issues except that he startled easily. He said that his sleep had improved and he did not experience nightmares. Overall, Dr. Sebastien noted improvement in the claimant's condition.

On September 29, 2017, Dr. Thomas Amason, a state agency medical consultant, completed a disability determination explanation for the claimant. (R. 75-79, 84-86). Dr. Amason reviewed the entire evidence record and opined that the claimant's IBS was a non-severe impairment. He noted that the claimant had normal physical functioning, including normal abdominal and gastrointestinal functioning.

Also on September 29, 2017, Dr. Lee Blackmon, a state agency mental health consultant, completed a medically determinable impairments and severity analysis and assessed the claimant's mental residual functional capacity based on his review of the entire evidence record. (R. 80-84). Dr. Blackmon opined that the claimant would benefit from a flexible schedule; might miss one or two days a month of work because of psychiatric signs and symptoms; would need his own work area to minimize anxiety; could handle only non-intensive and casual interaction and contact with the general public; could handle only casual, non-confronting, or supportive criticism and feedback from supervisors and coworkers; and should experience only infrequent and gradually introduced changes in the workplace.

*The ALJ Hearing*

On April 5, 2018, the ALJ held a hearing at which the claimant appeared without representation. At the hearing, the claimant testified that he had last worked for the Social Security Administration in April 2017. (R. 37). He claimed that his hours dwindled down as his PTSD symptoms negatively affected his ability to work.

The claimant testified that he had last received treatment for his mental health issues at the VA in January or February 2018. (R. 39). He said that he was taking medications as prescribed by the VA doctors for his mental health issues. The claimant also reported attending counseling sessions with Ms. Nault during this time.

When the ALJ asked the claimant if any of his treating medical providers recommended specific restrictions of functioning, the claimant testified that Ms. Nault decided that he needed sporadic breaks from work. (R. 41-42). The ALJ acknowledged Ms. Nault's treatment notes that indicated that the claimant's symptoms had increased due to daily stressors in the workplace,

that the claimant would need one to two days off per week, and that he needed a change in job position to better suit his needs.

The ALJ then stopped the hearing to inform the claimant about his right to representation. (R. 43-45). The ALJ reviewed the "Waiver of Right to Representation" form with the claimant and made sure that the claimant understood the waiver. The claimant indicated that he understood all the terms of the waiver and signed the document.

Next, the ALJ asked the claimant to describe, in his own words, how the evidence in his case showed that he was unable to perform the functions of any job. (R. 45-47). The claimant began by explaining how he prepared for the hearing. He said that he had not left the house in three days because he had been concerned that he might miss the hearing if he did. He claimed that he had not slept two of the past three nights and that he only slept two to three hours the previous night. He said that he woke up four-and-a-half-hours before the hearing to prepare himself. He arrived at the location of the hearing almost four hours before it started to further prepare himself mentally. The claimant testified that going to work every day required the same amount of mental preparation.

The ALJ asked the claimant to explain his difficulty in performing jobs, rather than preparing for jobs. (R. 46-47). The claimant testified that his stress levels increased quickly and that his panic attacks, anger, and frustration caused him to shut down and not think clearly. He testified that he often did not have the energy to perform menial tasks such as showering, shaving, or speaking to family members. He claimed that he had maintained employment at the Social Security Administration for as long as he did only because he "made a decision" to provide for his family, but that the stress of work eventually resulted in a complete inability to interact with his family.

Next, the ALJ asked the claimant about his ability to perform a predominately sedentary hypothetical job. (R. 48). At this hypothetical job, he could stand if he needed, he would be sequestered from other co-workers and not have to interact with other people, and he would examine objects and make assessments based on certain criteria. The claimant responded that he previously had a job that met that description, but could not perform his work responsibilities because of high stress levels and lack of sleep.

The claimant then talked about his experience in the military as a drill instructor. (R. 49). He testified that he was initially successful in advancing his career in the military but had to retire in early 2013 because he could no longer function properly.

Next, the claimant called his wife to testify as a witness. (R. 50-57). The claimant's wife testified that her husband's PTSD was "really, really bad." She testified that he got upset easily and acted "kind of like a light switch, he turns on, he turns off." She testified that he could not handle any stressors and struggled with severe anxiety. She claimed that when things got to be too much for him, the claimant would lie down in bed and not leave the bed for a week. She testified that the claimant had experienced only about 10 good days in the past month.

The claimant's wife testified that the claimant suffered from IBS which meant "he has diarrhea and he vomits all the time." (R. 52). She testified that her husband's illness prevented him from being able to function as a father. She said that he also struggled with memory loss and would often forget things.

The claimant's wife testified that they had been together eight years and married for nearly five years. She said that they met while they were both in the military. She claimed that he used to consume more alcohol, but had "really cut back." She said that the claimant does not

like to drink but sometimes needs alcohol to "get off the edge." (R. 55). She also testified that the claimant had flashbacks, nightmares, and night sweats.

Next, the ALJ called a vocational expert, Renee Smith, to testify. (R. 58-63). The VE testified that she had reviewed the information concerning the different jobs the claimant had performed over the last 15 years and she provided a thorough description of these jobs and the skills required to perform them. The ALJ posed a hypothetical question about an individual who would need a separate work area with at least three feet of separation from co-workers, could handle only occasional or brief interaction with the public, co-workers, or supervisors, and needed infrequent or gradual introductions of changes in work setting or work expectations. The ALJ asked the VE if this hypothetical individual could perform any of the work that the claimant had previously done. The VE said that the hypothetical person would not be able to perform any of the claimant's past jobs, but the VE identified other unskilled jobs with medium, light, or sedentary exertion that this hypothetical individual could perform. These jobs included furniture cleaner, crate liner, and a marker. The VE testified that these jobs typically existed in different shifts across the country.

Next, the ALJ asked the VE to consider another hypothetical individual who had the same limitations but also would need unscheduled breaks and might have absences for medical treatment. (R. 62-63). The VE responded that the vocational acceptable tolerance for being off-task was no more than 15% of the workday and that no more than two days of absence from work per month would be allowed. The VE testified that her testimony was consistent with the DOT and her training, education, and experience in the field.

The claimant then questioned the VE.  (R. 63-65).  He asked her to clarify her answer regarding work absences and being off-task during the workday.  The VE repeated her previous answers to the question.

At this point in the hearing, the claimant's wife attempted to interject, but the ALJ stopped her.  (R. 65-66).  The ALJ instructed the claimant's wife that she could only respond to questioning from the claimant.  After further conferring with his wife, the claimant asked the ALJ to stop the hearing and allow him the opportunity to obtain representation because he did not understand any of the VE's answers.  The ALJ reiterated the VE's answers for the claimant. (R. 67).

The claimant again asked for an opportunity to seek representation and reconvene at a later date.  The ALJ agreed to give the claimant that opportunity.  The ALJ told the claimant, "[i]f you want to have a supplemental hearing with an attorney I'll ask you, number one, to retain an attorney or other qualified representative and then your attorney or other qualified representative can file a request for a supplemental hearing."  (R. 69).  The claimant expressed concern that he would not be treated fairly because of his previous employment with the Social Security Administration, and the ALJ assured the claimant that he would have a fair hearing and explained where the hearing might take place.  No evidence shows that the claimant obtained a representative, that he filed a request for a supplemental hearing, or that a supplemental hearing took place.

### *The ALJ's Decision*

In a decision dated June 7, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act.  First, the ALJ found that the claimant met the insured status

requirements through December 31, 2021 and that the claimant had not engaged in substantial gainful activity since the alleged onset date of October 15, 2016.  (R. 16-17).

Next, the ALJ found that the claimant's anxiety disorders constituted a severe impairment.  (R. 17-18).  The ALJ found that the claimant's IBS was non-severe because his treating physicians had only attempted conservative treatment measures and Dr. Amason, the state agency medical consultant, opined that the claimant's IBS was non-severe.  The ALJ also found that the claimant's insomnia and history of alcohol consumption did not produce more than minimal functional limitations that had lasted at least twelve months and that those two conditions were non-severe impairments.

Next, the ALJ analyzed whether the claimant had an impairment or combination of impairments that met or medically equaled the severity of one of the impairments included in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18-19).  The ALJ started his analysis with considering whether the claimant's impairments satisfied the paragraph B criteria.  The ALJ noted that the claimant's impairments would satisfy the paragraph B criteria if the claimant demonstrated at least one extreme or two marked limitations in a broad area of functioning.  The ALJ relied on Dr. Blackmon's opinion in conducting this analysis.  The ALJ noted that in September 2017, Dr. Blackmon opined that the claimant's mental impairments resulted in no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself.  (R. 18-19).  Though Dr. Blackmon did not examine the claimant, the ALJ afforded Dr. Blackmon's opinion significant weight because "he reviewed all evidence of record and based his opinion upon his medical expertise, his review of the evidence, and his familiarity with the disability program and its requirements."  (R. 19).  The

ALJ also credited Dr. Blackmon because he "provided specific reasons for his opinions about the claimant's degree of functional limitation, showing these opinions grounded in both the objective medical evidence and the claimant's allegations regarding symptoms and limitations." (R. 19).

The ALJ then found that the claimant had only a mild limitation in understanding, remembering, or applying information. (R. 19). To support his finding, the ALJ noted that mental status exams conducted during the claimant's visits to the VA and with Ms. Nault repeatedly found the claimant's memory to be grossly intact. The ALJ also noted that Dr. Blackmon opined that the claimant had no limitation of understanding, remembering, or applying information. Based on this evidence, the ALJ questioned the claimant's testimony that he experienced memory loss.

The ALJ then found that the claimant had moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (R. 19). The ALJ based his finding on the medical records that showed that the claimant's stress and irritability symptoms improved with treatment, mental status exam results that showed the claimant's improved attention and concentration, and Dr. Blackmon's same opinions on the matter.

Having found that the claimant's mental impairments did not cause one extreme or at least two marked limitations in a broad area of functioning, the ALJ found that the claimant's impairments did not satisfy the paragraph B criteria.

Next, the ALJ considered whether the claimant's impairments satisfied the paragraph C criteria. (R. 19). The ALJ found that the evidence failed to establish a presence of the paragraph C criteria because the record did not establish a medically documented history of a disorder over

a period of at least two years and evidence of both treatment that diminished the claimant's symptoms and only minimal capacity to adapt to changes in the claimant's life.

Next, the ALJ found that the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c), except that he had the following non-exertional limitations: he needed a separate work area with at least three feet of separation from other co-workers; his interaction with the public, co-workers, and supervisors should be no more than brief and occasional; and any change in his work setting or work expectations should be infrequent and gradually introduced. (R. 20-22).

The ALJ held that, though the claimant's medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations, the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 21).

Specifically, the ALJ noted that the record indicated that the claimant had received mental health treatment for PTSD, including medication and therapy, that improved his symptoms and mental health functioning. (R. 21). The ALJ noted that the claimant had never been hospitalized for his mental health issues. The ALJ found that the record showed that the claimant denied suffering from nightmares and did not experience homicidal or suicidal ideations. And the ALJ noted that medical reports indicated that the claimant's appetite and energy were fair and his mental status exam was normal.

The ALJ noted that the claimant visited with a psychiatrist at the VA in 2017 and reported that he had no anxiety at home and had no other significant issues except that he startled easily. The ALJ noted that, in July 2017, the claimant declined referral options for PTSD services at the VA, indicating that he was satisfied with his current mental health providers and

denied any significant mental health concerns at that time. The claimant also reported doing volunteer work and being capable of performing all of his work duties in only a few hours. (R. 21-22).

The ALJ then turned to the opinion evidence in the record. First, the ALJ assigned Dr. Flournoy's opinion good weight because it was consistent with the totality of the evidence. (R. 22). Next, the ALJ gave only some weight to Ms. Nault's opinions because, as a Licensed Professional Counselor, she was not an acceptable medical source, and her opinions were not supported by objective evidence or consistent with the totality of the evidence. (R. 22). The ALJ also assigned some weight to Dr. Hanover's opinions because her opinions were not entirely consistent with the totality of the evidence or even her own treatment records that indicated that the claimant's mental functioning improved with treatment, and because Dr. Hanover had not seen the claimant in eight months at the time she submitted her opinions. (R. 23). And the ALJ reviewed the claimant's GAF scores and assigned them only some weight because they were not consistent with the totality of the evidence, especially the evidence showing that the claimant's mental functioning improved with treatment. (R. 23).

The ALJ then assigned significant weight to Dr. Blackmon's opinions regarding the claimant's RFC because Dr. Blackmon reviewed all of the evidence on record, based his opinions on his own medical expertise, and provided specific reasons for his opinions grounded in both the objective medical evidence and the claimant's statements of his symptoms and limitations. (R. 23).

Next, the ALJ considered the claimant's 100% disability rating from the VA. (R. 24). The ALJ noted that he was not bound by decisions or disability ratings from the VA or other agencies under 20 CFR §§ 404.1504 and 416.904, but he acknowledged that he was required to

evaluate the VA's disability rating because it may provide insight into the claimant's impairments and show the degree of disability that the VA determined based on the agency's own rules. The ALJ ultimately gave the 100% disability rating from the VA only some weight because the ALJ found that the rating did "not correlate with any specific work-related mental or physical limitations that assist the Administrative Law Judge in making a determination of the claimant's residual functional capacity." (R. 24).

At step four of the sequential evaluation process, the ALJ determined that the claimant could not perform his past relevant work based on the VE's testimony. (R. 24-25). Then, at step five, the ALJ considered the claimant's age, education, work experience, and residual functioning capacity and determined that jobs existed in significant numbers in the national economy that the claimant could perform. (R. 25-26). As support for his decision, the ALJ cited the VE's testimony that the claimant could work as a furniture cleaner, crate liner, or marker.

Having found that jobs existed in significant numbers in the national economy that the claimant could perform, the ALJ found that the claimant was not disabled under the Social Security Act. (R. 26).

## VI. DISCUSSION

### A. <u>Whether the ALJ Properly Evaluated the Medical Opinion Evidence</u>

The claimant first argues that the ALJ committed several errors in his evaluation of the medical opinion evidence in the record. The claimant contends that the ALJ erroneously (1) assigned significant weight to the opinion of Dr. Blackmon, a reviewing—not treating or examining—source; (2) assigned only some weight to the opinion of Dr. Hanover, a treating physician; (3) assigned only some weight to Ms. Nault's opinion; (4) assigned only some weight to the claimant's GAF scores; and (5) omitted from the claimant's RFC the part of Dr.

Fluornoy's opinion that the claimant would experience occasional decreases in work efficiency and intermittent periods of inability to perform tasks. (R. 8-14). For the following reasons, the court finds that the ALJ did not commit reversible error in his evaluation of the medical opinion evidence.

The ALJ is responsible for assessing the medical evidence and determining a claimant's residual functioning capacity. *See* 20 C.F.R. § 404.1526; *Walker*, 826 F.2d at 1000 n.1. When an ALJ assesses medical opinions in the record to determine the claimant's RFC, the ALJ must "state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 F. App'x 410, 418–19 (11th Cir. 2006) (citing *Sharfarz*, 825 F.2d at 279).

The ALJ in this case analyzed opinions from treating sources and from non-treating sources. The ALJ must give substantial weight to the opinion of a treating source if medically acceptable clinical and laboratory diagnostic techniques supports it and the opinion is not inconsistent with the other evidence in the record. 20 C.F.R § 404.1527(c); *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). If the ALJ does not assign substantial weight to a treating physician's opinion, then the ALJ must provide good cause for doing so. 20 C.F.R. § 404.1527(c); *Lewis v. Callahan*, 125 F.3d 1436, 1440–41 (11th Cir. 1997). Good cause exists to not assign substantial weight to a treating physician's opinion when the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 764 F.2d at 1241. And an ALJ can credit the opinion of a non-treating source over the opinion of a treating source if substantial evidence supports the ALJ's decision to do so and the ALJ articulates good cause for his decision. *Id.*; *Sryock v. Heckler*, 764 F.2d 834, 835

(11th Cir. 1985); *see Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 902 (11th Cir. 2012) (finding that "the ALJ did not err by crediting the opinions of non-treating sources over those of the treating physician" because the treating physician's opinion "was not bolstered by the evidence" and the evidence supported a contrary opinion reached by non-treating sources).

Here, because Dr. Blackmon was only a reviewing source and did not treat or examine the claimant, the claimant argues that the ALJ erroneously afforded Dr. Blackmon's opinion significant weight and unreasonably credited his opinion over the opinion of the claimant's treating physician, Dr. Hanover. The ALJ assigned only some weight to Dr. Hanover's opinion that the claimant's mental condition "resulted in total occupational and social impairment." (R. 23). On the other hand, the ALJ assigned significant weight to Dr. Blackmon's opinion that the claimant had a less limited RFC. (R. 23). But, contrary to the claimant's argument, the ALJ articulated good cause for doing so and substantial evidence supports his decision.

The ALJ explained that he afforded lesser weight to Dr. Hanover's opinions "because they are not entirely consistent with her treatment records or the totality of the evidence, which documents that the claimant's mental functioning improved with treatment." (R. 23). The ALJ specifically noted that Dr. Hanover had not seen the claimant in eight months at the time she completed the PTSD Benefits Questionnaire on which she marked that the claimant had "total occupational and social impairment." (R. 23, 773). The ALJ also specifically noted that Dr. Hanover reported during her last visit with the claimant in January 2016 that the claimant's PTSD symptoms had improved. (R. 23, 803).

And the record supports the questions that the ALJ raised about Dr. Hanover's opinion. As the ALJ stated, Dr. Hanover's notes of her five sessions with the claimant show that the claimant's PTSD symptoms improved over time and her notes are not consistent with a finding

that the claimant was totally impaired. (R. 794-804). Dr. Hanover completed the PTSD Benefits Questionnaire on September 1, 2016, but her last visit with the claimant occurred on January 4, 2016. (R. 777, 803-04). And Dr. Hanover reported at the claimant's last visit with her that the claimant was "doing better about coping with stressful things," was not feeling as overwhelmed or consumed by anxiety, had a stable mood, and had decreased panic. (R. 803-04). So substantial evidence supports the ALJ's finding that Dr. Hanover's opinion was inconsistent with her own treatment notes.

Also, substantial evidence supports the ALJ's finding that the other evidence in the record did not support Dr. Hanover's opinion. Dr. Hanover's opinion was inconsistent with the opinion of Dr. Flournoy, another treating physician, who, as the ALJ stated, opined that the claimant's general functioning was satisfactory with normal routine behavior, self-care, and conversation. (R. 22, 462). Dr. Hanover's opinion also was inconsistent with Dr. Blackmon's opinion that, based on a review of all of the medical evidence, the claimant's mental functioning improved with treatment and medication therapy. Dr. Blackmon based his opinion on a comprehensive review of all of the record evidence, his medical expertise, and familiarity with the disability program. Though Dr. Blackmon was only a reviewing source, the ALJ had good cause to credit Dr. Blackmon's opinion over Dr. Hanover's opinion because substantial evidence supports the ALJ's finding that Dr. Hanover's opinion was inconsistent with her own treatment notes and not supported by the evidence. *See Phillips*, 764 F.2d at 1241, and *Forrester*, 455 F. App'x at 902 (both finding that an ALJ may credit the opinion of a non-treating source over that of a treating source if the evidence does not support the treating source's opinion, the treating source's opinion is inconsistent with her own treatment notes, or the evidence supports a

contrary conclusion).  So substantial evidence supports the weight that the ALJ assigned to the opinions of Dr. Hanover and Dr. Blackmon.

Next, the claimant argues that the ALJ erred by assigning less than substantial weight to Ms. Nault's opinions that the claimant could not interface with the public and needed a flexible and irregular work schedule because of his PTSD, sleep issues, need for therapy, and flareups. The court disagrees.

As a Licensed Professional Counselor, Ms. Nault is not an "acceptable medical source" under 20 C.F.R. § 404.1502, but the ALJ still considered her opinions using the same factors that apply to opinions from acceptable medical sources under 20 C.F.R. § 404.1527.  The ALJ found that Ms. Nault's opinions were "not well-supported by objective evidence" and "not entirely consistent with the totality of the medical evidence, which documents that the claimant's mental functioning improved with treatment."  (R. 22).  And substantial evidence supports the ALJ's finding.  As explained above, Dr. Flournoy opined that the claimant's general functioning was satisfactory with normal routine behavior, self-care, and conversation; Dr. Hanover's treatment notes show that the claimant's mental functioning improved with treatment; good cause existed for the ALJ to not assign significant weight to Dr. Hanover's opinion that the claimant had total occupational and social impairment; and Dr. Blackmon, whose reviewing opinion the ALJ had good cause to credit over Dr. Hanover's opinion, opined that the claimant's condition improved with treatment.  (R. 80-84, 462, 794-804).  So the ALJ explained why he assigned only some weight to Ms. Nault's opinions and substantial evidence supports the ALJ's decision.  Thus, the ALJ did not commit reversible error in this regard.

The claimant also argues that the ALJ erred by affording only some weight to the claimant's GAF scores.  But the Commissioner has declined to endorse the GAF scale for use in

disability programs and has stated that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)). Even so, the ALJ explicitly acknowledged the claimant's GAF scores and assigned them only some weight because the scores were not entirely consistent with the totality of the record, especially the parts that indicated that the claimant's mental functioning improved with treatment. So, because the ALJ considered the claimant's GAF scores and articulated specific reasons for assigning them only some weight, substantial evidence supports the weight that the ALJ gave to the claimant's GAF scores.

Finally, the claimant contends that the ALJ committed reversible error by not including *all* of Dr. Fluornoy's opinions in the claimant's RFC. The ALJ assigned good weight to Dr. Fluornoy's opinions, but the ALJ did not include in the claimant's RFC Dr. Fluornoy's opinion that the claimant would experience occasional decreases in work efficiency and intermittent periods of inability to perform occupational tasks. (R. 20, 462). The claimant asserts that, because SSR 83-10 defines "occasional" as "occurring from very little up to one-third of the time," Dr. Fluornoy's opinion could show that the claimant is unable to perform tasks for up to one-third of the day, which would contradict the claimant's RFC as found by the ALJ.

But the ALJ did not commit reversible error by not including in the claimant's RFC Dr. Fluornoy's opinion that the claimant would experience occasional decreases in work efficiency and intermittent periods of inability to perform occupational tasks. Although an ALJ must state the weight he gave to different medical opinions, the ALJ does not have to "'specifically refer to every piece of evidence in his decision, so long as the ALJ's decision' enables the district court 'to conclude that the ALJ considered [the claimant's] medical condition as a whole.'" *Adams v.*

*Comm'r, Soc. Sec. Admin.*, 586 F. App'x 531, 533 (11th Cir. 2014) (quoting *Dyer*, 395 F.3d at 1211). Here, as the court explained above, the ALJ stated that he gave good weight to Dr. Fluornoy's opinions and the ALJ's decision—particularly the ALJ's reliance on the rest of Dr. Fluornoy's opinions, Dr. Hanover's treatment notes, and Dr. Blackmon's opinions that contradicted the need for occasional long breaks—shows that the ALJ considered the claimant's condition as a whole and substantial evidence supports the ALJ's decision to not include occasional long breaks in the claimant's RFC.

Also, the claimant's argument regarding the definition of "occasional" under SSR 83-10 fails to persuade the court. No evidence shows that Dr. Fluornoy intended to adopt the Social Security Ruling's definition of "occasional," much less the "occurring . . . up to one-third of the time" part of the definition as opposed to the lesser "occurring . . . very little" part. And Dr. Fluornoy's opinion that the claimant's general functioning was satisfactory with normal routine behavior, self-care, and conversation does not support the claimant's speculation about what Dr. Fluornoy meant.

So, because the ALJ stated the weight he gave to each medical opinion in the record and substantial evidence supports his decisions, the ALJ did not commit reversible error in evaluating the medical opinions.

**B.** **Whether the ALJ Failed to Properly Consider the Claimant's 100% Disability Rating from the VA**

Next, the claimant argues that the ALJ failed to properly consider the claimant's 100% disability rating from the VA. For the following reasons, the court disagrees.

The Eleventh Circuit has found that, "[a]lthough the V.A.'s disability rating is not binding on the [SSA], it is evidence that should be given great weight." *Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984) (quotation omitted). "Great weight" does not mean controlling

weight, but "the ALJ must seriously consider and closely scrutinize the V.A.'s disability determination and must give specific reasons if the ALJ discounts that determination." *Brown-Gaudet-Evans*, 673 F. App'x at 904 (citing *Rodriguez*, 640 F.2d at 686).

In another case where a claimant had a 100% disability rating from the VA, the Eleventh Circuit affirmed the Commissioner's decision that the claimant was not disabled under the Social Security Act despite the VA rating. *See Pearson v. Astrue*, 271 F. App'x 979 (11th Cir. 2008) (as an unpublished Eleventh Circuit opinion, *Pearson* is persuasive, but not controlling, authority). There, the claimant asserted that the ALJ erred by not finding the claimant disabled because the VA concluded that the claimant was totally disabled because of bipolar disorder, back pain, and hypertension. The Eleventh Circuit noted that, like the VA did for the claimant in this case, the VA based its finding of disability on the VA's definition of disability under 38 C.F.R. § 3.340(a)(1), *not* the Social Security Act's definition. *Pearson*, 271 F. App'x at 981. The Eleventh Circuit affirmed the Commissioner's decision that the claimant was not disabled despite the VA's rating because "[t]he record establishes that the administrative law judge considered the rating in his decision and correctly explained that a claimant had to satisfy a more stringent standard to be found disabled under the Social Security Act." *Id.*

In this case, the ALJ explicitly considered the claimant's 100% disability rating from the VA. (R. 24). And the ALJ provided specific reasons for giving the VA rating only some weight. The ALJ explained that the VA rating did not "correlate with any specific work-related mental or physical limitations that assist the Administrative Law Judge in making a determination of the claimant's residual functional capacity." (R. 24). So, like the ALJ that did not commit reversible error in *Pearson*, the ALJ in this case considered the VA rating but explained that the rating was not considerably probative of any specific work-related limitations that would form

part of the claimant's RFC under the Social Security Act. Thus, the ALJ did, in fact, articulate a legitimate reason for assigning only some weight to the VA's disability rating and did not commit reversible error in this regard.

**C.**     **Whether Substantial Evidence Supports the ALJ's Finding that the Claimant's IBS and Insomnia Were Non-Severe Impairments**

Next, the claimant argues that substantial evidence does not support the ALJ's finding that the claimant's IBS and insomnia were non-severe impairments. The court disagrees.

An impairment is severe if it significantly affects a claimant's ability to perform work-related activities, regardless of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(c), 4040.1521(a). Here, substantial evidence supports the ALJ's decision that neither the claimant's IBS nor insomnia met this definition.

The record indicates that the claimant was diagnosed with IBS, but the ALJ noted that no treating physician has ever diagnosed the claimant with *severe* IBS. Instead, medical providers had always treated the claimant's IBS with conservative measures. For example, the claimant's primary care provider, Dr. Ali, instructed the claimant to stay hydrated, add fiber to his diet, and take over the counter medicine; no medical provider had ever prescribed IBS medication for the claimant and the claimant only sought limited treatment for IBS. (R. 376). And Dr. Amason classified the claimant's IBS as non-severe because of the claimant's normal abdominal and gastrointestinal functioning. (R. 79). So substantial objective medical evidence supports the ALJ's decision that the claimant's IBS was a non-severe impairment.

Also, substantial evidence supports the ALJ's decision that the claimant's insomnia was a non-severe impairment. No objective medical evidence from an acceptable medical source demonstrates that the claimant's insomnia significantly impacted his ability to perform work-related activities. Ms. Nault opined that the claimant's PTSD symptoms would significantly

interrupt his sleep schedule, but, as stated above, Ms. Nault is not an acceptable medical source because she is a Licensed Professional Counselor and thus her statements cannot establish the severity of the claimant's insomnia under 20 CFR § 404.1521. And several treatment notes from visits to the VA show that the claimant had some, but not severe, issues with sleeping. (R. 491, 586, 890).

So, because substantial evidence supports the ALJ's finding that the claimant's IBS and insomnia were non-severe impairments, the ALJ did not commit reversible error during step two of the sequential evaluation process.

**D.**     **Whether the ALJ Afforded the Claimant a Full and Fair Hearing**

Finally, the claimant argues that the ALJ failed to afford the claimant a full and fair hearing because the ALJ "cut off [the] claimant and vocational testimony without allowing for further examination, refused to stop the hearing when asked by [the claimant], and proceeded to close the hearing despite [the claimant's] stated confusion regarding the hearing process and meaning of the vocational testimony." (Doc. 9 at 9). For the following reasons, the court finds that the ALJ afforded the claimant a full and fair hearing.

A claimant is entitled to a full and fair hearing, which includes his due process right to an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Martz*, 649 F. App'x at 962 (quoting *Eldridge*, 424 U.S. at 333); *Kelley*, 761 F.2d at 1540. If an unrepresented claimant is unfamiliar with hearing procedures, then the ALJ's duty to facilitate a full and fair hearing rises to the level of a special duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). And if the claimant asserts that he unknowingly waived the right to counsel or that the ALJ failed his heightened special duty to explore for all of the relevant facts, then "[t]here

must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record." *Graham*, 129 F.3d at 1423.

In this case, the claimant asserts that the ALJ first deprived him of a full and fair hearing because, according to the claimant, the ALJ cut off the claimant's examination of the VE and the claimant's wife. (Doc. 7 at 19) (citing R. 57-73). But the ALJ did not cut off the claimant's examination of the VE. Instead, the claimant asked the VE to repeat some of her testimony, the VE did so, the ALJ asked the claimant if he had any further questions for the VE, and the claimant said that he did not. (R. 63-65). So the claimant, not the ALJ, ended the claimant's examination of the VE.

And the ALJ did not commit reversible error when he moved on to the VE's testimony after the claimant's wife testified without first asking the claimant if he had any further questions to ask his wife. The claimant directly examined his wife as a witness. (R. 51-52). Then the ALJ asked the claimant's wife several questions about the claimant's mental condition at home, military history, and alcohol consumption. (R. 52-57). Then the ALJ said, "let's move our questioning to our vocational expert" and began his examination of the VE. (R. 57-58). Though the ALJ did not ask the claimant if he had any more questions for his wife before moving on to the VE, the ALJ did not cause any prejudice to the claimant, and thus did not violate his due process rights, because the claimant examined his wife directly and the ALJ then "scrupulously and conscientiously" examined the claimant's wife with thorough questioning. *Cowart*, 662 F.2d at 735. So the ALJ did not commit reversible error when he moved on from the claimant's wife's testimony to the VE's testimony.

Next, the claimant asserts that the ALJ deprived him of a full and fair hearing when, according to the claimant, the ALJ refused to stop the hearing when the claimant said that he wanted to do so. But the claimant, not the ALJ, continued the hearing after the claimant said that he wanted to stop the hearing.

After the claimant and the ALJ finished questioning the VE, the claimant's wife briefly interjected to say that the claimant was sick and the claimant then said, "[a]t this time I would like to stop my hearing and not continue and seek representation from an outside source." (R. 65-66). The ALJ responded, "[a]ll right," and said that he would give the claimant one week to submit a military discharge form discussed earlier in the hearing. (R. 66). But the claimant continued; he asked the ALJ to clarify some of the VE's testimony, explain whether the waiver of representation form permitted the claimant to stop the hearing and seek representation, and explain where a supplemental hearing would be held. (R. 66-72). The ALJ answered all of the claimant's questions. So the ALJ did not refuse to stop the hearing and the claimant did not suffer any prejudice after he said that he wanted to stop the hearing.

Finally, the claimant contends that the ALJ deprived him of a full and fair hearing because, according to the claimant, the ALJ improperly handled the claimant's stated confusion about the VE's testimony and the hearing process. The court disagrees.

As explained above, the ALJ answered all of the claimant's questions about the VE testimony and the hearing process after the claimant said that he wanted to stop the hearing. The ALJ then gave more special attention to the claimant's concerns by allowing the claimant to stop the hearing so that he could seek representation even though the waiver of representation form did not give the claimant that right. (R. 68-69). And the ALJ informed the claimant how he could obtain a supplemental hearing. The ALJ told the claimant, "[i]f you want to have a

supplemental hearing with an attorney I'll ask you, number one, to retain an attorney or other qualified representative and then your attorney or other qualified representative can file a request for a supplemental hearing." (R. 69). Then the ALJ explained some of the supplemental hearing process. (R. 69-72). But no evidence shows that the the claimant retained an attorney or filed a request for a supplemental hearing.

So, contrary to the claimant's argument, the record shows that the ALJ fulfilled his heightened duty owed to the claimant by answering all of the claimant's questions and explaining how he could receive a supplemental hearing. And, in any event, the claimant suffered no prejudice. The ALJ directed the claimant to retain an attorney and file a request for a supplemental hearing; the claimant simply failed to do so. So the record shows that the ALJ afforded the claimant a full and fair hearing and never deprived the claimant of his due process rights.

## VII. CONCLUSION

For the reasons stated above, the Commissioner followed the correct legal standards and substantial evidence supports his factual conclusions. So, by separate order, the court will **AFFIRM** the Commissioner's decision.

**DONE** and **ORDERED** this 18th day of March, 2020.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE